UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————————————

Amy G. DeJohn,

                                     Plaintiff,

            -v.-                                  5:09-CV-01315
                                             (NPM-ATB)

Wal-Mart Stores East, LP; Wal-Mart
Stores East, Inc.; Wal-Mart Stores, Inc.;
and Donald DeFeo,

                                     Defendants.

———————————————————————————————

APPEARANCES:                      OF COUNSEL:

Attorneys for Plaintiff:

O'HARA O'CONNELL & CIOTOLI     STEPHEN CIOTOLI, ESQ.
7207 East Genesee Street
Fayetteville, NY 13066

Attorneys for Defendants:

LITTLER MENDELSON, P.C.         MICHAEL KESSEL, ESQ.
900 Third Avenue                            JOEL L. FINGER, ESQ.
New York, NY 10022-4834

One Biscayne Tower                  SCOTT, FORMAN, ESQ.
2 South Biscayne Boulevard
Suite 1500
Miami, FL 33131

Neal P. McCurn, Senior District Judge

### *MEMORANDUM-DECISION and ORDER*

### *I.  Introduction*

Presently before the court in this employment discrimination action is a motion for summary judgment by defendants ("Defendants"), Wal-Mart Stores East, LP; Wal-Mart Stores East, Inc.; Wal-Mart Stores, Inc. (collectively, "Walmart"); and Donald DeFeo ("DeFeo"), seeking dismissal of the entire action against them by plaintiff, Amy G. DeJohn ("Plaintiff").  Plaintiff opposes and Defendants reply.  Decision on the pending motion is rendered based solely on the parties' written submissions, without oral argument.

### *II.  Procedural Background*

Plaintiff commenced this action on November 24, 2009, after receiving a right-to-sue letter from the United States Equal Employment Opportunity Commission ("EEOC") on October 28, 2009.[1]  See Dkt. Nos. 1, 5.  By her Amended Complaint, filed December 11, 2009, Plaintiff alleges claims against Walmart of gender discrimination, hostile work environment, disparate treatment and retaliation under both Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII") and the New York Human Rights Law, N.Y. Executive Law § 290, *et seq.* ("NYHRL"), as well as a claim for violation of her rights under the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA").  In addition, Plaintiff alleges a claim against DeFeo for aiding and abetting discrimination

---

[1]     Plaintiff filed her complaint with the New York State Division of Human Rights ("DHR"), which has a work-sharing agreement with the United States Equal Employment Opportunity Commission ("EEOC").  Thus, in New York, complaints are deemed to be cross-filed with both DHR and EEOC whenever a New York claimant files with either agency.  See Francis v. Blaikie Group, 372 F. Supp. 2d 741, 746. n.7 (S.D.N.Y. 2005) (aff'd 177 F. App'x 121 (2d Cir. 2006)).

under the NYHRL.

Following completion of discovery, Defendants filed the pending motion for summary judgment.

### III.  Factual Background

In accordance with the Local Rules of this court, the following facts, which are undisputed unless otherwise indicated, are gleaned from Defendants' Statement of Material Facts and Plaintiff's response thereto.  In addition, in Plaintiff's memorandum of law in opposition to Defendants' motion for summary judgment, she sets forth a lengthy recitation of the facts, which includes facts not addressed in Defendants' Statement of Material Facts or her response thereto.[2] For the sake of completeness, these facts, where relevant and admissible, have also been considered.[3]

───────────────────

[2]     Also in her opposition memorandum of law, Plaintiff erroneously asserts that for purposes of deciding Defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the allegations of fact in Plaintiff's complaint must be accepted as true, apparently confusing the Rule 56 standard with the standard for deciding a motion to dismiss under Rule 12(b)(6).

[3]     Plaintiff also encourages the court to consider the probable cause determination of the New York State Division of Human Rights ("DHR").  To be sure, "a finding of probable cause by an administrative agency . . . though not determinative, is admissible to help establish [a] prima facie case [of discrimination under Title VII]." Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir. 1985). Whether the DHR decision is admissible evidence, however, is subject to the sound discretion of the district court.  See Sadki v. SUNY College at Brockport, 310 F. Supp. 2d 506, 517 (W.D.N.Y. 2004) (citing Paolitto v. John Brown E. & C., 151 F.3d 60, 65 (2d Cir.1998)).  Here, the DHR's decision is apparently based solely on unsworn allegations from Plaintiff and DeFeo, and includes credibility findings that are appropriately left to the province of a jury.  Moreover, the human rights specialist that conducted the investigation noted that "[t]here are several questions of fact that would be best answered in a public hearing where witnesses will be under oath."  Ex. G to Ciotoli Aff.  Accordingly, while the subject of Plaintiff's complaint to DHR and the fact of a probable cause finding are

Plaintiff was hired by Walmart as a management trainee in 1993. Later that year, she was promoted to assistant manager. Plaintiff became co-manager of the Rome, New York store in 1998. Almost two years later, Plaintiff was promoted to store manager of the Oneida, New York store. At all relevant times, defendant DeFeo was a market manager, and Plaintiff's direct supervisor. There is a dispute in the record as to whether Plaintiff was promoted by, or at the recommendation of, DeFeo, or whether Plaintiff was promoted by regional vice president Todd Harbaugh, without recommendation by DeFeo.[4] It is undisputed, however, that DeFeo terminated Plaintiff on October 2, 2008.

On November 7, 2008, Plaintiff filed a complaint against Walmart with the DHR charging unlawful discriminatory practices under the NYHRL. After an investigation, the DHR found probable cause that Walmart engaged in unlawful discriminatory practices. On September 1, 2009, at the request of Plaintiff, the DHR dismissed her complaint for administrative convenience so that she could seek remedies in federal court. After receiving a right-to-sue letter from the EEOC, Plaintiff commenced this action.

---

admissible to establish this court's jurisdiction, the DHR's specific findings are not admissible evidence in this case and will not be considered in deciding Defendants' motion for summary judgment.

[4]    See Decl. of Amy G. DeJohn, Jan. 11, 2012, ¶ 2, Dkt. No. 40-6 ("DeJohn Decl.") (Plaintiff was promoted by Todd Harbaugh, not DeFeo); Dep. of Amy G. DeJohn, Feb. 16, 2011, 57:1-58:13, Ex. A to Decl. of I. Michael Kessel, Nov. 30, 2011 ("Kessel Decl."), Dkt. No. 37-7 ("DeJohn Dep.") (Harbaugh told Plaintiff she was promoted and Plaintiff speculates that DeFeo did not recommend her for the promotion, without personal knowledge of same); Decl. of Donald DeFeo, Nov. 26, 2011, ¶ 3, Dkt. No. 37-5 ("DeFeo Decl.") (DeFeo interviewed Plaintiff and thereafter recommended that she be promoted); Dep. of Donald S. DeFeo, May 5, 2011, 115, Ex. B to Kessel Decl., Dkt. No. 37-7 ("DeFeo Dep.") (DeFeo promoted Plaintiff).

### *A.  Plaintiff's Complaints Regarding Compensation*

During the time of Plaintiff's employment, she was compensated with a salary and a bonus based on her store performance.  In January 2006, the end of fiscal year 2006, Walmart changed its bonus compensation structure for all store managers.  According to Defendants, the structure was changed from one based solely on profit to one based on yearly profit and store revenues.  Plaintiff complained about the new plan, but Walmart, through its regional vice president, Paul Busby, decided the plan would stand.  According to Plaintiff, while she was on maternity leave in 2005, her store received the most difficult sales and profit plan for fiscal year 2006, and her bonus was based on that plan.  She began complaining to Busby about the plan change in April 2005, stating that she felt she was being discriminated against, but nothing was done to change the bonus plan policy.  See DeJohn Aff., ¶ 12.  At his deposition, DeFeo admitted that Plaintiff had been complaining that she was short on a bonus.  See DeFeo Dep., 56-57, at Ex. C to Aff. of Stephen Ciotoli ("Ciotoli Aff."), Jan. 13, 2012, Dkt. No. 40-3.  It is undisputed that in 2008, Plaintiff again complained about being short on a bonus. Thereafter, an investigation took place, resulting in Plaintiff being paid approximately $12,000 that she was due in bonus compensation.  While DeFeo claims the shortage was from fiscal year ending 2006, the supporting documentation submitted by Defendants reflects that the shortage was actually for fiscal year ending 2007, not 2006.  See Ex. B to DeFeo Decl.  The 2007 fiscal year ended January 31, 2007.  See id.  DeFeo testified that the shortage was a mistake on the part of Walmart's finance department.  See DeFeo Dep., 56-57.  DeFeo further testified that Plaintiff was the only store manager in his market who was short on her bonus, and that none of the male managers experienced a shortfall.

<u>See</u> DeFeo Dep., 58:4-9.

### B.  Plaintiff's February 2008 Coaching

Walmart employees are disciplined according to its "Coaching for Improvement Policy."  There are generally four steps of coaching, including a verbal coaching, a written coaching, a "Decision-Making Day" coaching, which is a final opportunity for an employee to evaluate and change his or her behavior or job performance before termination, and finally, termination.  Coaching levels may be skipped and more serious levels of coaching may be used depending on the conduct at issue.

In February 2008, Plaintiff received a verbal coaching for poor business judgment as a result of her improper use of Cash Fund Transfers ("CFTs"), which are Walmart funds budgeted for store initiatives such as associate picnics, charity donations, and local invoices.  All CFTs were to be made to authorized Walmart vendors, and all transactions over $100 required approval of a market manager. During a routine audit, market asset protection auditor, Vincent Santilli, observed a number of CFTs that were either unexplained or were for the exact amount of $100.  Suspecting that expenses were  divided to $100 or less so that they would not be reviewed by the market office, Santilli further reviewed the records with DeFeo and discovered that several of Plaintiff's CFTs were for expenses that were not authorized by DeFeo.  Consequently, Plaintiff was given a verbal coaching for failure to seek market office approval for CFTs and for using unauthorized vendors.  Further, Plaintiff was told that going forward, she should not break down CFTs of greater than $100 into amounts of $100 or less, not use unauthorized vendors, and ensure that her management team was aware of those directives.

According to Plaintiff, prior to February 2008, DeFeo instructed her to

6

break down CFTs into increments of $100 or less so that it would not show up on a report for his supervisor to see.  <u>See</u> DeJohn Aff., at ¶ 38.  By way of example, Plaintiff alleges that when she needed to purchase approximately 600 picture frames for employee awards, DeFeo told her to split up that expense into increments of $100 or less.  <u>See</u> id., ¶ 39.  According to the listing of CFTs from the Oneida store, Plaintiff purchased those frames on February 1, 2008.  <u>See</u> Ex. A to Decl. of Vincent Santilli ("Santilli Decl."), Dkt. No. 37-6.  Plaintiff alleges that DeFeo again instructed her to account for CFTs in this away at a meeting in March 2008, after she received the coaching, thereby giving her a mixed message regarding how she should account for CFTs in excess of $100 going forward.  <u>See</u> DeJohn Aff. at ¶ 39.  DeFeo testified that there was one occasion when he gave Plaintiff permission to break down a large purchase into CFTs of $100 or less, and that was for the purchase of picture frames.  <u>See</u> DeFeo Dep., 296:14-18.  DeFeo testified that this occurred around the time of Plaintiff's coaching, and that prior to the coaching she was told not to account for purchases in this way.  <u>See</u> id., 169:2-16.  In September 2008, Plaintiff gave a signed, written statement to market asset protection manager David Oakes during his investigation of questionable CFTs found in August 2008.  <u>See</u> Ex. N to Decl. of Elizabeth Hatch, Dkt. No. 37-4.  In this eight-page statement, Plaintiff never mentioned that DeFeo told her to break up CFTs into increments of $100 or less after her February 2008 coaching.  <u>See</u> id.

### *C.  Plaintiff's Complaint Regarding Scheduling*

In 2008, Walmart implemented a new scheduling system for store managers nationwide, which required all managers to work a rotating work schedule instead of a fixed one.  According to Plaintiff, during a meeting in June 2008, DeFeo handed out the new schedule to Plaintiff and the other managers in attendance, but

7

singled Plaintiff out, telling her alone not to ask for any special requests.  See DeJohn Aff., ¶ 23.  Plaintiff complained to the regional vice president's human resources director, Baldomero Silva, that the new schedule was unfair to her and all female store managers, especially those with children, but Silva told her to just get used to it.  See id.  Plaintiff next complained to Walmart's executive vice president, Bill Simon.  Eventually, however, DeFeo changed the managers' schedule in his market back to a fixed schedule.  See id. ¶¶ 23-24.  DeFeo decided to go back to the fixed schedule on his own, without a directive from his superiors, after all of the managers except one said that they wanted the fixed schedule.  See DeFeo Dep., 158.  Plaintiff admits that the schedule change was a nationwide action that impacted both men and women.  See DeJohn Dep., at 207-208.

### D.  Plaintiff's Termination

Plaintiff was terminated on October 2, 2008.  According to Defendants, Plaintiff was terminated for (1) failing to report a sexual harassment complaint, (2) the unauthorized sale of Walmart property, (3) use of an unauthorized vendor, (4) failing to properly use and account for vending machine income, and (5) failing to properly account for CFTs.

### 1.  Failure to Report a Sexual Harassment Complaint

On June 10, 2008, a Walmart associate in the Oneida store told another associate, Patty Keller, that an assistant manager at the store was making her feel uncomfortable, including that he gave the associate his cell phone number and private email address, told her he was married but getting a divorce, and told her he wanted to hang out with her.  Later that week, Ms. Keller saw Plaintiff at a charity event.  At that time, Ms. Keller told Plaintiff that an associate complained that the assistant manager was sexually harassing her.  Plaintiff told Ms. Keller

that Plaintiff was off the clock and that Ms. Keller should have the associate come to see Plaintiff when they are back at the store.  After the charity event, neither the associate, nor Ms. Keller, ever came to see Plaintiff about the alleged harassment.  During the following week, when Plaintiff was at the store, and the week thereafter, when she was out on vacation, Plaintiff did nothing about the report of alleged sexual harassment.  After Plaintiff went on vacation, her co-manager, Chris Lahue, received a report of the alleged sexual harassment, and immediately opened an investigation.

In July 2008, Lahue contacted market human resources manager, Elizabeth Hatch, and informed her of the investigation against the assistant manager.  Once Hatch understood that Plaintiff had failed to commence the investigation, Hatch took over the investigation against the assistant manager and began to investigate the report that Plaintiff failed to take any action in response to the report of alleged sexual harassment.  Hatch concluded that the assistant manager engaged in sexually inappropriate conduct and that Plaintiff improperly failed to respond to a report of sexual harassment against the assistant manager.

Walmart's Discrimination and Harassment Prevention Policy, last updated October 16, 2007, provides, among other things, that if a member of management receives a report, or otherwise becomes aware of any violations of the Policy, he or she must immediately report such conduct to the appropriate level of management for investigation.  See Ex. D to DeFeo Decl.  The Policy also advises that "[a] Salaried Member of Management who fails to report a violation of this Policy may be subject to discipline, up to and including termination."  Id.

Plaintiff contends that she was not trained in the "new reporting requirements" under the anti-discrimination policy until July 2008, which required

9

follow-up on a claim of discrimination no matter where it is first learned of or from whom.  DeJohn Aff., ¶ 27.  Walmart store manager Scott Louer testified that while this training was the most in-depth training he had received about the anti-discrimination policy, it was not training on a new policy.  See Dep. of Scott Louer, 12-13, 22, at Ex. F to Ciotoli Aff.  Plaintiff also contends that it is Walmart's policy that if a manager is approached "off the clock," the proper procedure is to have the associate contact the manager at work.  See id. ¶¶ 26-27.  DeFeo also testified that this is a proper procedure.  See DeFeo Dep., 103:3-22.  Moreover, a Power Point presentation at the July 2008 training, included the directive to ensure the associate is "on the clock" when meeting to discuss a report of discrimination.  See Ex. M to Ciotoli Aff.  However, this same Power Point includes the directive to respond promptly when put on notice of allegations of misconduct.  See id.

### 2.  *Unauthorized Sale of Walmart Property*

During Hatch's investigation into the handling of the June 2008 sexual harassment allegation, she discovered that Plaintiff sold a used industrial stand mixer from the Oneida store to an assistant manager for $200.  Because Plaintiff did not have authorization to sell this Walmart asset, Hatch assigned market asset protection manager David Oakes to conduct a separate investigation.  Oakes interviewed Robert Bird, the assistant manager that purchased the mixer.  Mr. Bird stated that he was aware of a mixer in the bakery department that wasn't being used and had some missing parts. He asked Plaintiff if he could purchase the mixer, and offered to pay $200, since it was missing parts and he was unsure if it worked.  Later, Mr. Bird stated, he checked online and saw that the mixer "could be worth about $4000."  Ex. I to Hatch Decl.  Oakes requested a depreciated value

from the corporation that manufactured the mixer, stating that it was in "excellent condition" at the time of sale.  Ex. K to Hatch Decl.  According to the corporation, "street value" for the mixer, in "top shape," would have been $9500 - $10,000.  Id.

Plaintiff stated that she accepted the $200 for the mixer and added it to a charitable donation account.  Plaintiff admitted that she had no idea how much the mixer was worth, but that in the past she had been given direction to sell old equipment.  By way of example, Plaintiff stated that she previously sold equipment from the meat department, with permission from the district manager. See Ex. J to Hatch Decl.  Plaintiff testified that she sold the mixer to Mr. Bird for $200 without permission from DeFeo and without knowing the value of the mixer. See DeJohn Dep., 167:5-168:13.  See also DeJohn Aff. ¶ 31.  However, Plaintiff alleges that DeFeo told managers to sell unused equipment "for whatever we could get for it."  Id. ¶ 32.  Plaintiff alleges that another store manager sold a television to a contractor for his personal use at a significantly reduced price, and although this manager was demoted, he was not fired.  See id. at ¶ 33.

Another Walmart store manager, Scott Louer, testified that he has seen old equipment being thrown away in the past, but that he is unsure whether it was approved by a market-level manager.  See Louer Dep., 26:4-9.  Louer further testified that it was always his understanding that the approval and authorization of a market-level manager was required in order to sell old equipment.  See id., at 27:22-28:1.  According to Louer, he understood that managers were required to get what they could for old equipment via a bidding process, albeit an informal one, whereby word of mouth with associates and customers was used.  See id., 28:2-15.

Finally, it is important to note that while Plaintiff does not dispute that she

11

sold the mixer for $200 and that she was investigated regarding the sale, she does dispute that this was a basis for her termination.  In support of this dispute, Plaintiff cites her exit interview paperwork, which states that she was terminated for gross misconduct "[a]s a result of Redbook Investigations, PD-19[5] violations, poor business judgement, and repetitive performance previously coached on 2/29/08 (sic)," Ex. I to Ciotoli Aff., but states nothing about the sale of the mixer.

### *3.  Use of an Unauthorized Vendor*

During the investigations of the alleged sexual harassment and the sale of the mixer, it was discovered that Plaintiff used an unauthorized vendor for an inflatable bouncer toy for children, which was used at an associate picnic, without permission from DeFeo.  In her statement to Oakes, Plaintiff says that "it never dawned on her" that she was using an unauthorized vendor.  Ex. N to Hatch Decl., at 675.  Plaintiff testified that in this statement she explained that she erroneously failed to keep her market manager informed of the expenditures for associates within her store.  See DeJohn Dep., 183.  See also Ex. N to Hatch Decl., at 676.  In her affidavit, Plaintiff points out that another store in her area used an unauthorized vendor for an inflatable bouncer at an associate picnic on the same day as the Oneida store's picnic.  See DeJohn Aff. ¶ 37.

Plaintiff also argues, without foundation, that she was terminated for the use of unauthorized vendors as it relates to the vending machines in her store's break room.  Accordingly, Plaintiff's supporting arguments regarding male managers' use of these same vendors need not be considered.

---

[5]     PD-19 is Walmart's Discrimination and Harassment Prevention Policy, and a RedBook investigation is an investigation into allegations of discrimination and/or harassment under that Policy.  See DeFeo Decl. ¶¶ 12,13.

### *4.  Failure to Properly Use and Account for Vending Machine Income*

Another issue that arose during these investigations was Plaintiff's failure to properly use and account for vending machine income.  An associate in the Oneida store's accounting department reported to Oakes that money from the store-owned vending machines in the break room was being used to fund store functions on occasion, including the associate picnic.  See Ex. M to Hatch Decl.  This associate further reported that money from the vending machines was not being kept in the "vending income account," but was kept as cash in a blue bag that was hidden inside the snack machine.  See Ex. O to Hatch Decl., at 664.  Oakes reported that Plaintiff stated she was aware of the cash being kept in the snack machine for the past six years and "had no real answer" when asked why the income was not reported in the vending income account.  Id., at 665.

Plaintiff testified at her deposition that she was not aware that the money from the vending machines was being kept in cash instead of being deposited into the vending machine account, and did not learn that this was being done until her investigation.  See DeJohn Dep., 178:16-180:18.  Plaintiff agreed, however, that the income from the vending machines was taxable income and should be reported.  See id., at 179:16-25.  By affidavit, Plaintiff alleges that DeFeo "previously[] asked [her] invoice clerk while she was filling the [vending] machines how we managed the machines and he was fine with it.  He never stated that we were doing something wrong or told [sic] to stop."  DeJohn Aff., at ¶ 37.

### *5.  Failure to Properly Account for CFTs in August 2008*

Also during the investigations, Santilli discovered unusual CFT activity in the Oneida store related to expenditures for the associate picnic.  See Santilli Decl.

13

¶ 5, Ex. B.  The CFTs for the picnic were recorded in a series of $100 amounts, with the reason given as "associate picnic" and one entry of $421.19 with "store picnic" as the stated reason.  See id., Ex. B.  Oakes interviewed Oneida store assistant manager John Dermody about the CFT invoice.  According to Dermody's signed statement to Oakes, he broke up the expenditures for the inflatable structure used at the picnic into $100 increments with the approval of Plaintiff.  See Ex. L to Hatch Decl.  Plaintiff refers back to her allegation that she received mixed messages regarding the proper procedure for recording CFTs, in particular her allegation that in March 2008, after her February 2008 coaching on this issue, DeFeo directed her to record CFTs in increments of $100.

## *IV.  Discussion*

### *A.  Legal Standard*

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the initial burden to show the court why it is entitled to summary judgment.  See Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir.2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986)).  If the movant meets its burden, the burden shifts to the non-movant to identify evidence in the record that creates a genuine issue of material fact.  See id., at 273 (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348 (1986)).

When deciding whether a material issue of fact is in dispute, the court is cognizant that "[a] fact is material when it might affect the outcome of the suit under governing law."  Tracy v. Freshwater, 623 F.3d 90, 95 (2d Cir.2010) (internal citation omitted).  Also, a material fact is genuinely in dispute "if 'the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Bessemer Trust Co., N.A. v. Branin, 618 F.3d 76, 85 (2d Cir.2010) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986)).

"In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir.2008) (internal quotation and citation omitted). Finally, when the court is deciding a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor. See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598 (1970)).

It should also be noted that, pursuant to Local Rule 7.1(a)(3), the court deems admitted any properly supported statement of material fact that is not specifically controverted by the opposing party. See N.D.N.Y. R. 7.1(a)(3). See also Figueroa v. Tri-City Highway Prods., Inc., No. 08-CV-868, 2010 WL 3635247, at *2 (N.D.N.Y. Sept.10, 2010) (citations omitted).

## B.  Claims Against Walmart

### 1.  Title VII & NYHRL Claims

Plaintiff seeks relief against Walmart on her claims of disparate treatment, gender discrimination, hostile work environment and retaliation, under both Title VII and NYHRL.  The analysis of each claim is identical under both statutes.[6]

---

[6]    See Madray v. Long Island Univ., No. 10-CV-3841, 2012 WL 2923500, at *13 (E.D.N.Y. Jul. 16, 2012) (citing Crespo v. New York City Transit Auth., No. 01-CV-671, 2002 WL 398805, at *10 (E.D.N.Y. Jan. 7, 2002)) (analysis of claim for

To be sure, Plaintiff alleges claims of gender discrimination and hostile work environment based on disparate treatment.  A plaintiff may establish a claim of disparate treatment under Title VII based on gender either (1) by showing that she has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of sex, or (2) by demonstrating that harassment based on sex amounted to a hostile work environment.  Price, 829 F. Supp. 2d at 219 (quoting Feingold v. State of New York, 366 F.3d 138, 149 (2d Cir.2004)).  Here, Plaintiff's disparate treatment claim is subsumed by her claims of gender discrimination and hostile work environment, and will be analyzed accordingly.

### a.  Gender Discrimination

To survive a motion for summary judgment, a plaintiff claiming discrimination under Title VII and the NYHRL must satisfy the burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  See Sotomayor v. City of New York, — F. Supp. 2d —, 2012 WL 1889780, at *18 (E.D.N.Y. 2012).  First, under the McDonnell Douglas framework, a plaintiff must establish a prima facie case of gender discrimination

---

hostile work environment is the same under Title VII and NYHRL); Stewart v. City of New York, No. 11-CV-6935, 2012 WL 2849779, at *5 n.1 (S.D.N.Y. Jul. 10, 2012) (citing Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir.2010); Torres v. Pisano, 116 F.3d 625, 629 (2d Cir.1997)) (NYSHRL claims of discrimination are subject to the same analysis as Title VII claims); Caban v. Richline Group, Inc., No. 10-CV-559, 2012 WL 2861377, at *14 (S.D.N.Y. Jul. 10, 2012) (citing Patane v. Clark, 508 F.3d 106, 115-17 (2d Cir.2007)) (retaliation claims are subject to the same analysis under Title VII and NYHRL); Price v. Cushman & Wakefield, Inc., 829 F. Supp. 2d 201, 219 n.15 (S.D.N.Y. 2011) (disparate treatment claim under NYHRL is subject to same analysis as the identical claim under Title VII).

by demonstrating that (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  See Leibowitz v. Cornell University, 584 F.3d 487, 498 (2d Cir. 2009).  Once the plaintiff meets this burden, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  See id.  If the employer can meet its burden, the burden shifts back to the plaintiff to demonstrate that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination.  See id. (internal quotation marks and citation omitted).  "The plaintiff can sustain her burden by proving that 'the evidence in [her] favor, when viewed in the light most favorable to the [her], is sufficient to sustain a reasonable finding that [the adverse employment decision] was motivated at least in part by ... discrimination.'" Sotomayor, — F. Supp. 2d —, 2012 WL 1889780, at *19 (quoting Tomassi v. Insignia Fin. Group, 478 F.3d 111, 114 (2d Cir.2007)).

Plaintiff argues that she was discriminated against by Defendants based on her gender when she was subjected to an unfair schedule, was not compensated appropriately, and was terminated.

### *i.  Termination*

Defendants argue they are entitled to summary judgment on Plaintiff's gender discrimination claim as to her termination because Plaintiff cannot meet her initial burden to establish the fourth element of this claim, which is that Plaintiff was terminated under circumstances giving rise to an inference of

discrimination.[7]  Defendants argue that (1) because DeFeo is the same person that both promoted and terminated Plaintiff, an invidious motivation may not be imputed to him; (2) DeFeo based his decision to terminate Plaintiff on information given to him by Oakes and Hatch, neither of whom Plaintiff claims discriminated against her; (3) Plaintiff cannot show that a similarly situated male store manager was treated more favorably; and (4) Plaintiff cannot show that anyone at Walmart ever said anything derogatory to her about her gender.

Defendants also argue that even if Plaintiff can establish a prima facie case of gender discrimination, they have met their burden to articulate legitimate, non-discriminatory reasons for Plaintiff's termination, and Plaintiff cannot show that these reasons are a pretext for discrimination.

### ***Same Actor Inference***

Regarding Defendants' argument that they are entitled to the "same actor

---

[7]     Defendants apparently do not dispute that Plaintiff is a member of a protected class or that she was qualified for her position.  They do dispute Plaintiff's claim that she was terminated under circumstances giving rise to an inference of discrimination.  Because Plaintiff was disciplined, but not terminated, for her failure to follow company policy in promoting an hourly associate to a department manager position in 2006, Defendants argue, Plaintiff cannot rely on same in support of her discrimination claim.  Plaintiff does not dispute this argument anywhere in her papers.  Further, it is clear that "an employee does not suffer a materially adverse employment change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."  Rozenfeld v. Department of Design & Const. of City of New York, — F. Supp. 2d —, 2012 WL 2872157, at *9 (E.D.N.Y. 2012) (quoting Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006).  Accordingly, the court need not, and will not, discuss or consider the details of the aforementioned 2006 discipline of Plaintiff by Defendants.

inference," while it is true that "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire[,]" Cordell v. Verizon Communications, Inc., 331 F. App'x 56, 58 (2d Cir. 2009) (quoting Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir.2000)), here there is a question of fact as to whether DeFeo promoted Plaintiff to store manager. Accordingly, this is not an appropriate inference for the court to consider on summary judgment.

### *Discriminatory Animus of Investigators*

Next, Plaintiff does not dispute Defendants' argument that she has failed to establish discriminatory intent on behalf of DeFeo, since he relied on the results of investigations by Oakes and Hatch, both of whom Plaintiff testified did not have any discriminatory bias against her.  See DeJohn Dep., at 91.  Defendants cite caselaw in support of this argument, wherein a court concluded that the plaintiff failed to establish discriminatory bias against his employer, where the employer relied on the results of an investigation to terminate the plaintiff's employment, and the plaintiff did not allege any discriminatory animus on behalf of the investigator.  See Octobre v. Radio Shack Corp., No. 07-CV-3311, 2010 WL 850189, at *9 (S.D.N.Y. Mar. 11, 2010) (finding that an employer may rely on even erroneous information in making employment decisions, so long as it does so in good faith).  While not alone dispositive of Plaintiff's discrimination claim, the fact that DeFeo took an adverse employment action against Plaintiff based on the results of investigations by Oakes and Hatch is relevant to establish a lack of discriminatory intent on his part.

### *Treatment of Similarly Situated Male Managers*

Defendants also argue that Plaintiff fails to establish that a similarly situated male manager was treated more favorably than her.  Plaintiff disputes this argument.  The parties agree that in order for Plaintiff to establish the fourth element of her prima facie case of gender discrimination based on disparate treatment, she "must show that she was treated differently from similarly situated males." Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citation omitted).  The issue of whether fellow employees are similarly situated is somewhat strict.  See Brown v. Middaugh, 41 F. Supp. 2d 172, 184 (N.D.N.Y. 1999).  To be similarly situated, the individuals with whom plaintiff attempts to compare herself must be similarly situated in all material respects.  See Shumway, 118 F.3d at 64.  The individuals "must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." Brown, 41 F. Supp .2d at 184.  See also Aiello v. Stamford Hosp., No. 09-CV-1161, 2011 WL 3439459, at *15 (D. Conn. Aug. 8, 2011).

Defendants argue that there is no evidence in the record that any of their male employees were terminated under the circumstances giving rise to Plaintiff's termination, including failing to act on a report of sexual harassment; allowing CFTs to be broken up into increments of $100; using poor business judgment by disposing of a company asset; and failing to properly account for vending machine income.  Plaintiff argues that she was terminated for failure to immediately investigate a sexual harassment claim against one of her assistant managers, when

20

Walmart failed to immediately investigate her claims of discrimination after she was terminated.  Plaintiff also points out that a male manager that was demoted for selling a television to a contractor at a significant discount, but then later promoted to store manager, when she was terminated for selling the stand mixer for $200. See DeJohn Aff., ¶ 33.

Plaintiff further identifies disciplinary action taken against several male managers, none of whom were terminated as a result.  By affidavit, Plaintiff alleges that a male manager was promoted to store manager in Rome, New York after having forged an associate evaluation.  See DeJohn Aff. at ¶ 17.  Plaintiff alleges that another manager was given a Decision Day Coaching for inappropriate conduct, failing to follow the open door communications policy and disrespect of individuals.  Plaintiff alleges that before this coaching was to expire, DeFeo and Hatch decreased this manager's coaching level by one step, and one hour after this decrease, instituted another Decision Making Day Coaching for poor business judgment, which Plaintiff alleges should have been a termination had his previous Decision Making Day Coaching not been decreased one level. See id. ¶ 1.  The circumstances surrounding this manager's coaching for poor business judgment were that he allowed employees to work for many months outside of their job code.  See Ex. S to Ciotoli Aff.  DeFeo also testified regarding disciplinary action taken against several male managers, who were never terminated: verbal coaching for failing to meet deadlines associated with an inventory program; verbal coaching for poor inventory control and failure to keep shopping carts stacked in the store; and verbal coaching for work safety issues. Another male manager received a verbal coaching for poor business judgment due to sanitation issues in the deli and a written coaching for allowing assistant

21

managers to take meal breaks either too early or too late.  Finally, Plaintiff identified a male manager who received a Decision Making Day Coaching for use of profanity, inappropriate conduct and lack of respect for individuals due to his behavior during closed door meetings with other managers.  See DeFeo Dep., 237-248; Ex. S to Ciotoli Aff.

Defendants counter that none of the male managers identified by Plaintiff are similarly situated to her in that each of them was either not disciplined by DeFeo, not disciplined for integrity issues, as was Plaintiff, and/or not disciplined for multiple issues, as was Plaintiff.  Moreover, Defendants note that there was a male manager, Dan Snelling, who was terminated by DeFeo because of an integrity issue.  See Supp. Decl. of Elizabeth Hatch, Feb. 8, 2012, ¶ 2, Dkt. No. 44-3 ("Hatch Supp. Decl.").  According to Mr. Snelling's exit interview paperwork, he was terminated and labeled "non-hireable" by DeFeo for falsely reporting that he had interviewed three associates .  See Ex. A to Hatch Supp. Decl.

To be sure, viewing the evidence in a light most favorable to Plaintiff, there is a factual dispute regarding whether she knew, in August 2008, that she should not record CFTs in excess of $100 in increments of $100 or less, and there is also a factual dispute as to whether Plaintiff was aware that cash from the vending machines was not being deposited into the appropriate account.  However, it is undisputed that Plaintiff failed to follow Walmart policy to investigate a report of sexual harassment against an assistant manager in her store.  It is true that Plaintiff first learned of the alleged harassment during non-working hours, and appropriately directed the person making the report to contact Plaintiff, or have the employee alleged to have been harassed contact Plaintiff, during work hours.

22

However, there is no dispute that Plaintiff was required to investigate or report the allegation of sexual harassment once she returned to work but failed to do so. Also, it is undisputed that Plaintiff sold Walmart equipment without first assessing its value.  While there is a factual dispute about the value of the equipment, there is no dispute that Plaintiff failed to assess its value before selling it, and did so without notifying DeFeo.  None of the male managers who were disciplined engaged in similar behavior, and therefore are not similarly situated in all material respects.  Therefore, Plaintiff is unable to establish a fact question that she was terminated under circumstances giving rise to an inference of discrimination on this basis.

### ***Derogatory Treatment Based on Gender***

 Finally, Defendants argue, Plaintiff cannot establish that she was terminated under circumstances giving rise to an inference of discrimination because no one at Walmart said anything derogatory to Plaintiff based on her gender.  The only incident Plaintiff identifies is the alleged use of the term "you guys" directed at Plaintiff and her male colleagues during a manager meeting led by Mr. Santilli, regarding which Plaintiff complained to DeFeo.  First, the term "guys" as used in this context is commonly known to refer to persons of either sex and therefore, could not be deemed discriminatory.  Nonetheless, DeFeo acted on Plaintiff's complaint by immediately advising Santilli to never use the term "guys" again to address the group of managers in his market.  Accordingly, Plaintiff is unable to establish a fact question that she was terminated under circumstances giving rise to an inference of discrimination on this basis.

For the aforementioned reasons, Plaintiff is unable to identify a question of fact regarding any element of her gender discrimination claim based on her

termination, and therefore is unable to meet her burden to establish a prima facie claim of gender discrimination on that basis.

Even assuming Plaintiff could meet her burden to establish a prima facie case of gender discrimination, Defendants have met their burden to articulate legitimate, non-discriminatory reasons for Plaintiff's termination: Plaintiff failed to report a claim of sexual harassment in accordance with Walmart Policy, and Plaintiff failed to obtain the requisite approval before disposing of a Walmart asset. Plaintiff argues that the court should infer discrimination from the falsity of Defendants' reasons for Plaintiff's termination. However, for the reasons stated above, Defendants have articulated legitimate reasons for Plaintiff's termination that are non-discriminatory. Plaintiff is unable to raise any issues of fact to support a conclusion that such reason is a pretext for discrimination, because the record, viewed in a light most favorable to Plaintiff, does not sustain a reasonable finding that her termination was motivated in part by discrimination. Plaintiff is unable to identify any evidence to support her allegation that she was discriminated based on her gender. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims of gender discrimination regarding her termination.

### ii.  Schedule Change

Plaintiff also claims that Defendants discriminated against her based on her gender by subjecting her to an unfair work schedule. Plaintiff alleges that the schedule change negatively impacted female managers, especially those with children. However, the record shows that Plaintiff admits this schedule change impacted both men and women, and it is undisputed that DeFeo reverted to the fixed schedule after the majority of managers in his market complained about it.

24

Finally, Plaintiff fails to identify how the schedule change effected her more negatively than her male counterparts. Accordingly, Defendants are entitled to summary judgment on Plaintiff's disparate treatment gender discrimination claims regarding the schedule change.

### iii. Compensation

Finally, Plaintiff claims that she was discriminated against by Defendants based on her gender by failing to compensate her in the same manner as her male counterparts.

Defendants first argue that they are entitled to summary judgment on Plaintiff's compensation claim, whether pursuant to Title VII, NYHRL or the EPA, because it is barred by the applicable statute of limitations and because Plaintiff has proffered no evidence that she was paid less than similarly situated store managers.

Plaintiff counters that her compensation claim is timely under a continuing violation theory. Plaintiff's argument that a continuing violation theory applies in deciding whether her compensation claims are barred by the statute of limitations is not supported by law. The Court of Appeals for the Second Circuit has held that payment of unequal compensation under the EPA does not constitute a continuing violation as it is "fundamentally unlike other claims of ongoing discriminatory treatment because it involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action." Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 119 (2d Cir. 1997). See also Calvello v. Electronic Data Sys., No. 00-CV-800, 2004 WL 941809, at *2 (W.D.N.Y. Apr. 15, 2004); Fox v. CUNY, No. 94-CV-4398, 1998 WL 273049, at *3 (S.D.N.Y. May 27, 1998). Courts in this circuit have also applied that reasoning in Title VII discrimination

claims for disparate compensation.  See Kearney v. ABN Amro, Inc., No. 04-CV-6885, 2006 WL 2354819, at *3 (S.D.N.Y. Aug. 10, 2006); Quarless v. Bronx-Lebanon Hosp. Ctr., 228 F. Supp. 2d 377, 382 (S.D.N.Y. 2002); Calvello, 2004 WL 941809, at *2; Fox, 1998 WL 273049, at *3.  Accordingly, the court will not consider a continuing violation theory when deciding whether Plaintiff's compensation claims are time-barred.

Claims are timely under Title VII if an administrative complaint is filed within 300 days of the alleged discriminatory act, and a judicial action is filed within 90 days of receipt of a right-to-sue letter by the administrative body. See Ruggerio v. Dynamic Elec. Sys. Inc., No. 12-CV-100, 2012 WL 3043102, at *6 (E.D.N.Y. Jul. 25, 2012) (citing 42 U.S.C. § 2000e–5(e)–(f)).  Under NYHRL, however, the limitations period runs for three years from the date on which an action asserting NYHRL violations is filed, but this limitations period is tolled for the period between the filing of an administrative charge and the issuance of a right-to-sue letter.  See Sloth v. Constellation Brands, Inc., — F. Supp. 2d —, 2012 WL 2090079, at *10 (W.D.N.Y. 2012) (citing N.Y.C.P.L.R. § 214(2) (McKinneys 2008)).  Claims under the EPA are timely if filed within two years, or three years for willful violations.  See Morales v. City of New York Dep't of Juvenile Justice, No. 10-CV-829, 2012 WL 180879, at *7 (S.D.N.Y. Jan. 23, 2012.) (citing 29 U.S.C. § 255(a)).

Here, Plaintiff's administrative complaint was filed on November 7, 2008, her right-to-sue letter was issued on September 1, 2009 and this action was commenced on November 24, 2009.  The issue of when Plaintiff's claim accrued, however, is not known from the current record, although presumably it cannot have been before the conclusion of the 2007 fiscal year, which is January 31,

26

2007, as Plaintiff's challenged bonus would have been based on profits and revenues for that year.  Therefore, Plaintiff's NYHRL claim, which carries a three-year statute of limitations that was tolled between November 7, 2008 and September 1, 2009, is clearly timely.  Plaintiff's Title VII claim, however, must have accrued no earlier than January 12, 2008 in order for it to be considered timely, and Plaintiff's EPA claim must have accrued no earlier than November 24, 2007, or November 24, 2006 if the violation was willful.  Because there are factual questions, on which the record is silent, regarding when Plaintiff's compensation claim accrues, including when Plaintiff received her bonus pay for fiscal year ending January 31, 2007, and when she should have known that a claim arose, the court cannot determine as a matter of law whether Plaintiff's EPA claim or her Title VII claim regarding her compensation are timely.  Moreover, neither party briefed the issue of whether the alleged EPA violation was willful under that statute.

Defendants argue that regardless of the timeliness issue, they are entitled to summary judgment on Plaintiff's compensation claims because she has proffered no evidence that she was paid less than similarly situated store managers.  Specifically, Defendants argue that because Plaintiff has no knowledge of other store managers' compensation or why they received the figures they did, she cannot prevail on her compensation claims.  Nonetheless, the record reflects that male store managers in DeFeo's market did not experience the same shortfall in bonus compensation as did Plaintiff.  DeFeo testified that Plaintiff was the only store manager in his market who was short on her bonus, and that none of the male managers experienced a shortfall.  Moreover, Plaintiff complained about the unfairness of the new compensation structure as early as April of 2005.  DeFeo

testified that he was aware Plaintiff had been complaining that she was short on a bonus.  It was not until after Plaintiff was fired and she again complained about her bonus shortfall, that the matter was investigated and it was discovered that Plaintiff was due approximately $12,000 in bonus compensation for fiscal year ending January 31, 2007.  Therefore, Plaintiff has identified material fact issues regarding whether Defendants' intentionally discriminated against her based on her gender regarding her bonus compensation.

Accordingly, Defendants' motion for summary judgment is denied regarding Plaintiff's Title VII and NYHRL discrimination claims based on her compensation.  The merits of Plaintiff's EPA claim are discussed infra, at 33.

### b.  Hostile Work Environment

Plaintiff also alleges she was subjected to a hostile work environment by Walmart.  To be sure, the prohibition of discrimination under both Title VII and the NYHRL "is not limited to economic or tangible discrimination.  The phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."  Kaytor v. Electric Boat Corp., 609 F.3d 537, 546 -548 (2d Cir.2010) (citing 42 U.S.C. § 2000e-2(a)(1); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367 (1993)) (quotations omitted).  A hostile work environment is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victims' employment."  Id. (citing Harris, 510 U.S. at 21, 114 S. Ct. 367) (quotations omitted).  Where such an environment has been created, "Title VII is violated so long as there is a basis for imputing the conduct that

28

created the hostile environment to the employer." Id. "[A]n employer is presumed to be responsible where the perpetrator of the harassment was the plaintiff's supervisor." Id. (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275 (1998)).

Whether an environment is hostile or abusive can be determined only by looking at all the circumstances. Kaytor, 609 F.3d at 547 (citing Harris, 510 U.S. at 23, 114 S. Ct. 367. Such circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. "Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe." Id.

"It is axiomatic that to prevail on a claim of hostile work environment based on gender discrimination, the plaintiff must establish that the abuse was based on her gender." Kaytor, 609 F.3d at 547.

> Facially neutral incidents may be included among the totality of the circumstances that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory. Circumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that the same individual engaged in multiple acts of harassment, some overtly sexual and some not.

Id. at 547-548 (citations and quotations omitted).

29

Defendants argue that they are entitled to summary judgment on Plaintiff's hostile work environment claim because Plaintiff is unable to establish that she was subject to conduct that was severe or pervasive enough to constitute harassment nor can Plaintiff establish that she was subject to discriminatory conduct based on her gender.  Plaintiff counters that Defendants actions "affected the 'terms, conditions, or privileges' of [her] employment, including pay issues (bonus), scheduling, discipline, enforcement of company policy, lack of training, responding to complaints, showing favoritism to male store managers and holding Plaintiff to a different standard than the male store managers."  Pl.'s Mem. of Law, at 27, Dkt. No. 40.  However, Plaintiff fails to specifically identify the "discriminatory intimidation, ridicule, and insult" that she alleges is severe or pervasive, instead referring the court to the entire record.  A review of the record to identify "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," reveals that in the first instance, there is no evidence to establish any physically threatening conduct on behalf of Defendants.  Moreover, the only evidence of intimidation, ridicule or insult, viewed in a light most favorable to Plaintiff, are Santilli's referral to Plaintiff and her male co-workers as "guys," DeFeo singling Plaintiff out during a meeting with other managers by telling her alone not to complain about the subject schedule change, and DeFeo saying to Plaintiff "where is the duct tape so I do not have to listen to you when we tour the store," see Pl.'s Aff., ¶ 8.  No reasonable juror could conclude that those incidents rise to the level of severe or pervasive conduct.  Accordingly, Defendants' motion for summary judgment is granted regarding Plaintiff's hostile work environment claims.

### *c.  Retaliation*

Plaintiff next alleges a claim for retaliation.  In order to establish a claim for retaliation under Title VII and the NYHRL, a plaintiff must prove that: (1) she was engaged in a protected activity; (2) her employer was aware of that activity; (3) she suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse employment action.  See Stewart, 2012 WL 2849779, at *9 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006); Torres, 116 F.3d at 629 n.1).

Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation claim because she failed to exhaust administrative remedies.  Even if her retaliation claim is exhausted, Defendants argue, they are still entitled to summary judgment because (1) there is sparse evidence in the record to support Plaintiff's argument that her complaints were based on a protected category, i.e., here, gender, and (2) Plaintiff cannot establish a causal connection between her complaints and her termination.

"A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge."  Findlay v. Reynolds Metals Co., 82 F. Supp. 2d 27, 32 (N.D.N.Y. 200) (citing Butts v. City of New York Dep't of Hous. Pres. and Dev., 990 F.2d 1397, 1401 (2d Cir. 1993)). "Courts generally have no jurisdiction to hear claims not alleged in the employee's EEOC charge, as the purpose of the exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action." Id. (citing Butts, 990 F.2d at 1401 ("[T]he purpose of the notice provision, which is to encourage settlement of discrimination disputes through conciliation

and voluntary compliance, would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC.")) (internal quotations and citations omitted).

Plaintiff opposes Defendants' argument that she failed to exhaust her retaliation claim before the DHR, arguing that (1) she appeared pro se before the DHR and cannot be held to the same pleading standard as a party represented by counsel would be, and (2) the DHR investigator observed that "[t]he record shows that [Plaintiff] brought the problems she was having with management to human resources, but was unsuccessful in having a meeting to discuss the problems." See Pl.'s Mem. of Law at 28-29, Dkt. No. 40, citing Ex. G to Ciotoli Aff.

Here, it is clear from the DHR report that Plaintiff did not allege that any of the adverse action taken against her was done in retaliation for any complaints of discrimination. Moreover, the cited observation from the DHR investigator merely conveys that Plaintiff brought the problems she was having to the attention of her employer's human resources department. There is nothing in the DHR report to indicate that Plaintiff claimed she was retaliated against by Defendants for making that complaint. For this reason alone, the court does not have jurisdiction to hear Plaintiff's retaliation claim. Plaintiff's argument that she was somehow held to a lower standard of "pleading" when making a DHR complaint has no basis in the law. Where, as here, a pro se plaintiff fails to allege conduct giving rise to a Title VII claim in his or her administrative complaint, the court lacks jurisdiction to decide such a claim. See, e.g., Falso v. Salzman Group, Inc., 545 F. Supp. 2d, 295, 299 (W.D.N.Y. 2008).

Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's retaliation claims.

### *2.  EPA*

Plaintiff also alleges that Walmart violated her rights under the EPA when it willfully compensated her at a rate lower than its male employees.  In order to prove a claim of discrimination under the EPA, a plaintiff must show that (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions. See Butler v. New York Health & Racquet Club, 768 F. Supp. 2d 516, 528-529 (S.D.N.Y. 2011) (citing Lavin-McEleney v. Marist Coll., 239 F.3d 476, 480 (2d Cir. 2001)).  A plaintiff need not show that her job is identical to a higher paid position, but only must show that the two positions are substantially equal in skill, effort, and responsibility.  Id.

Once a plaintiff has established the elements of her claim, the burden shifts to the employer to prove that the pay differential is based on (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex. Id. (citing 29 U.S.C. § 206(d)(1); Corning Glass Works v. Brennan, 417 U.S. 188, 196, 94 S. Ct. 2223 (1974)).

Finally, it is important to note that in order to prove a claim under the EPA, a plaintiff need not prove that the defendant intentionally discriminated against her; it is sufficient that some pay differential exists. See Butler, 768 F. Supp. 2d at 529 (citing Lavin–McEleney, 239 F.3d at 483).

Here, Plaintiff has identified evidence in the record to support her claim that male managers in her market were paid differently than she was for substantially similar work, and Defendants have failed to meet their burden to establish that the

pay differential was based on a factor other than Plaintiff's sex.  For these reasons, and for the reasons articulated above regarding Plaintiff's Title VII and NYHRL discrimination claims based on compensation, Defendants' motion for summary judgment regarding Plaintiff's EPA claim is likewise denied.

### C.  NYHRL Aiding & Abetting Claim Against DeFeo

In order for a plaintiff to recover against an aider or abettor of NYHRL violations, she must establish "(1) that she engaged in conduct protected by the NYHRL; (2) there is a causal connection between the protected conduct and the alleged [violations] of the NYHRL; and (3) that [the defendant] 'actually participated' in the discrimination."  Beattie v. Guilderland Cent. Sch. Dist., 124 F. Supp. 2d 802, 805 (N.D.N.Y. 2000) (citations omitted).  See also N.Y. EXEC. LAW § 296.1(a) (McKinney 20).  Further, a plaintiff must show that the defendant "aided or abetted a primary violation of the NYHRL committed by another employee or the business itself."  Jordan v. Cayuga County, No. 01-CV-1037, 2004 WL 437459, at *4 (N.D.N.Y. Feb. 9, 2004) (quoting Bennett v. Progressive Corp., 225 F. Supp. 2d 190, 213 (N.D.N.Y. 2002) (internal quotation and emphasis omitted)).

DeFeo argues that he is entitled to summary judgment on Plaintiff's NYHRL claim against him because Plaintiff cannot establish a claim of discrimination against their employer, Walmart.  Because Defendants' motion is granted as to Plaintiff's NYHRL claims of hostile work environment, retaliation, and gender discrimination based on her termination and schedule change, DeFeo is likewise entitled to summary judgment on Plaintiff's NYHRL aiding and abetting claim against him on those bases.  However, because questions of fact remain as to Plaintiff's NYHRL gender discrimination claim against Defendants based on

34

disparate compensation, Plaintiff's NYHRL aiding and abetting claim against DeFeo shall go forward as well.  Although DeFeo alleges that the bonus shortfall was a mistake, and attributes that mistake to the finance department, he also admits knowing that Plaintiff had been complaining about the shortfall, but an investigation into the matter did not commence until after Plaintiff was terminated. Accordingly, a reasonable fact finder could determine that DeFeo aided and abetted discrimination against Plaintiff under the NYHRL.

## *V. Conclusion*

For the aforementioned reasons, it is hereby ORDERED that Defendants' motion for summary judgment, see Dkt. No. 37, is GRANTED in part and DENIED in part.

Remaining for resolution at trial are factual issues regarding Defendants' liability on Plaintiff's Title VII and NYHRL gender discrimination claims based on disparate compensation as well as Plaintiff's EPA claim, including underlying fact questions regarding the accrual of those claims, as well as factual issues regarding DeFeo's liability on Plaintiff's NYHRL aiding and abetting claims as to Plaintiff's allegation of gender discrimination based on disparate compensation.

The parties are strongly urged to negotiate a settlement regarding these remaining liability issues, as well as any damages, and shall report their progress to the court no later than thirty days from the filing of this order.

IT IS SO ORDERED.

DATED:     August 16, 2012
           Syracuse, New York

Neal P. McCurn
Senior  U.S. District Judge

35